IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
December 13, 2011 Session

**DELTA DEVELOPMENT CORPORATION, ZOO CONCESSION AND
GIFT, INC., and SMITH & ROGERS COMPANY**
v.
**F. FANI GULF INTERNATIONAL, GULF INTERNATIONAL, FAROKH
FANI, and F. FANI/GULF INTERNATIONAL**
v.
**FARIBORZ FERDOWSI; LELA FERDOWSI; FARZIN FERDOWSI; ZIBA
FERDOWSI; FARSHEED FERDOWSI; TALIEH FERDOWSI; AZAR
FERDOWSI; CYRUS AZHDARI; HOMAYOUN AMINMADANI; and
ZOHRE AMINMADANI**

Direct Appeal from the Chancery Court for Davidson County
No. 04-687-I     Claudia C. Bonnyman, Chancellor

No. M2010-02437-COA-R3-CV - Filed April 3, 2012

Defendants made a series of loans to Plaintiffs and a dispute arose as to the interest and
principal owed. A judgment was entered in favor of Defendants. However, Defendants
appealed the award, claiming that the trial court erred in admitting evidence, which allegedly
reduced the judgment amount, and in refusing to hold all shareholders of the Plaintiff
companies liable for the judgment. Plaintiffs also claim, on appeal, that the Special Master
and the trial court set an incorrect "starting point" for determining the judgment owed. We
affirm the Special Master and the trial court in all respects.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER,
J., and HOLLY M. KIRBY, J., joined.

Charles K. Grant, Lawrence C. Maxwell, Nashville, Tennessee, for the appellants, F. Fani
Gulf International, et al

William T. Ramsey, Philip D. Irwin, Nashville, Tennessee, for the appellees, Delta
Development Corporation, et al

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Fariborz Ferdowsi ("Fariborz") and Farokh Fani ("Mr. Fani") are natives of Iran who moved to the United States in the late-1970s during the Iranian Revolution. The men apparently enjoyed a close personal and business relationship until this action arose.

In the late 1980s and early 1990s, Fariborz became involved in a number of business ventures including Delta Development Corporation ("Delta") and Zoo Concession and Gift, Inc. ("Zoo Concession"), of which he claims to be the sole shareholder, and Smith and Rogers Company ("S & R") (collectively, "Plaintiff Companies"), of which he claims to be both a director and president but not a shareholder. According to Fariborz, Delta was formed to acquire both land and the necessary items to develop a zoo in middle Tennessee. A zoo facility was opened in the Joelton area, and Zoo Concession was formed to sell food and concessions there,[1] but the facility and its assets were subsequently sold to a non-profit company which operates the Nashville Zoo at Grassmere. S & R is a "gift and floral shop."

Fani owns and controls three entities including F. Fani Gulf International, Gulf International, and F. Fani/Gulf International, (collectively, with Mr. Fani, "Fani"), which sell decorative and floral supplies/items. Beginning in the early-1990s and continuing until 2002, Fani made a series of loans for "substantial sums of money" to Fariborz and Plaintiff Companies, some evidenced by promissory notes or by checks.[2] Fariborz repaid a portion of the loaned money, but a dispute arose as to the balance owed and to the interest charged.[3] On March 5, 2004, Plaintiff Companies–Delta, Zoo Concession and S & R–filed a declaratory judgment action against Fani claiming that usurious interest had been charged, and seeking a determination of interest owed.

Fani filed a counterclaim alleging that Plaintiff Companies had defaulted on the promissory notes and had attempted repayment with bad checks. Fani also filed a third-party complaint against Fariborz arguing that he had disregarded the corporate form of Plaintiff Companies by commingling the assets of each with one another and with his personal assets, and therefore, that he should be held jointly and severally liable for the debts and obligations of Plaintiff Companies. Fani subsequently amended its third-party complaint to name as

---

[1]According to Fariborz, Zoo Concession has been dissolved.

[2]Promissory notes, which list a Plaintiff Company as the "Maker," were executed by Fariborz.

[3]The chancery court found that the interest charged by Fani was not usurious because no interest was paid. The interest rate was set at 10%.

third-party defendants, alleged "current or former shareholders of one or more of the [Plaintiff Companies]" Lela Ferdowsi (Fariborz's wife); Farzin (Fariborz's brother) and wife Ziba Ferdowsi; Farsheed Ferdowsi (Fariborz's brother); Talieh Ferdowsi (wife of Fariborz's brother Faran); Azar Ferdowsi (Fariborz's sister); Cyrus Azhdari;[4] and Homayoun "Homey" and wife Zohre Aminmadani. Fani alleged that each third-party defendant had "approved of or ratified the actions of Fariborz Ferdowsi in commingling the funds of the [Plaintiff Companies] with his personal assets and with the assets of other corporations which he owns or controls" and therefore, that each should be held jointly and severally liable for the debts and obligations in question.[5]

On March 1, 2007, the chancery court entered an order directing that a bench trial be held based upon the complex accounting issues involved. The order further directed that the trial of the case would be bifurcated into (1) determining the debt owed and (2) addressing shareholder liability. On June 7, 2007, the Davidson County Chancery Court appointed a CPA "to marshal papers and analyze payments to be relied upon in this lawsuit" and to prepare a spreadsheet of stipulated and disputed loan amounts. Then, on November 13, 2007, the chancery court appointed Ben H. Cantrell as Special Master. The Special Master heard proof on January 22-25, 2008, and he issued a Report and a Supplemental Report on July 18, 2008. The Special Master found that "[a]lthough there are transactions involving Mr. Fani's companies as well as Mr. Fani personally and transactions involving Mr. [Fariborz] Ferdowsi's companies as well as Mr. [Fariborz] Ferdowsi personally, the parties have treated all the transactions as if they were between Mr. Fani and Mr. [Fariborz] Ferdowsi individually." The Special Master found that the appropriate "starting point" for calculating the debt owed was a schedule, prepared by the parties, showing loan disbursements and repayments, rather than handwritten letters from Fani which, according to Fariborz, evidenced a lesser balance owed. He then found that the schedule's disputed loans, with the exception of five exhibits, were legitimate and that the schedule's disputed payments should be credited to Fariborz.

Fani moved for entry of a judgment in the amount of $516,032.87, but Plaintiff Companies proposed judgment in the amount of $145,379.62, alleging errors by the Special Master. The chancery court referred certain matters, including a review of the spreadsheet and the proposed opposing orders of judgment, back to the Special Master in a January 16, 2009 order. On February 23, 2009, the Special Master submitted a (second) supplemental

---

[4]Cyrus Azhdari is now deceased.

[5]Fani's first amended third-party complaint was dismissed without prejudice because it failed to allege that S & R was currently without funds to pay its debts. However, Fani was allowed to file a second amended third-party complaint alleging such.

report, finding that as of January 31, 2009, Plaintiff Companies owed Fani $509,844.72. On March 25, 2009, the chancery court confirmed the Special Master's July 18, 2008 reports, and on April 14, 2009, it confirmed and adopted the Special Master's February 23, 2009 (second) supplemental report, including the $509,844.72 judgment.

The second phase of the trial focused on whether the corporate veil of the Plaintiff Companies should be pierced so as to hold the third-party defendants personally liable for the debt owed to Fani. Proof was presented over several days in September 2009 and March 2010. Thereafter, the chancery court issued its lengthy Memorandum and Order on September 23, 2010. In its order, the chancery court noted that Fariborz had conceded personal liability for any judgment in favor of Fani, but that he had continued to deny being an S & R shareholder. Despite his contrary assertions, the chancery court found that Fariborz was a 35% shareholder in S & R,[6] and it held him personally liable for the judgment in favor of Fani. The chancery court, however, found "no proof that any of the [other] Smith & Rogers shareholders were involved in wrongdoing" and that Fani "did not carry his burden to show that the 10 named shareholders engaged in inequitable use of the corporation or inequitable conduct toward Farokh Fani and his companies." Thus, it dismissed Lela Ferdowsi, Farzin and Ziba Ferdowsi, Farsheed Ferdowsi, Talieh Ferdowsi, Azar Ferdowsi, and Homayoun and Zohre Aminmadani from the third-party complaint.[7] Fani timely appealed.

## II. ISSUES PRESENTED

Fani presents the following issues for review, as summarized:

1. Whether the trial court erred in admitting into evidence the "general ledger" and certain checks, and in considering such evidence when calculating the judgment owed; and

2. Whether the trial court erred in not holding all third-party defendants individually liable.

---

[6]The chancery court found that Fariborz was a 35% owner with his wife, Lela, but it could not "further find how the stock is owned since there was no further proof on the subject of joint ownership."

[7]On November 4, 2010, the chancery court entered a [Corrected] Memorandum and Order to reflect that objections to the Special Master's reports were heard and to correctly reflect the judgment as $560,490.72.

-4-

Additionally, Plaintiff Companies and Third-Party Defendants present the following issue:

3.     Whether the Special Master and the chancery court erred in failing to accept Fani's handwritten statements and sworn testimony as to the appropriate starting point for calculating the loan balance.

For the following reasons, we affirm the decisions of the Special Master and the chancery court.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d) (2011)**; *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.,* 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.,* 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond,* 521 S.W.2d 806, 808 (Tenn. 1975)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.,* 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. Admissibility of General Ledger and Checks

We first address Fani's argument that the trial court improperly admitted the "general ledger" and certain checks into evidence. These errors, Fani claims, resulted in Plaintiff Companies erroneously receiving credit for approximately $1,000,000.00 in loan repayments.

"Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion. Thus, reviewing courts will not disturb these decisions on appeal unless the trial court has abused its discretion." *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002)). Additionally, trial courts have discretion to determine the applicability of a hearsay exception. *See Arias v. Duro Standard Prods. Co.*, 303 S.W.3d, 256, 262

(Tenn. 2010) (citing *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997)). An abuse of discretion will be found only where the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." *Id.* (citing *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d. 346, 358 (Tenn. 2008)).

### 1. General Ledger

Michael Shahsavari ("Shahsavari"), the CFO of Management Resources Company ("MRC"), a management company owned by Fariborz's brother Farzin Ferdowsi ("Farzin") and Fariborz's friend, Homayoun Aminmadani ("Homey"), testified that MRC "took over the financial accounting function for Smith & Rogers" in "[l]ate 2001 and early 2002." At that time, MRC began maintaining S & R's bank account and based upon weekly information provided by Fariborz, it began maintaining S & R's accounts payable and producing S & R's monthly financial statements. At some point, a single database titled "Delta Trades International" was created to store data regarding a number of Fariborz's businesses, including Plaintiff Companies. The admissibility of the database's "general ledger" is in dispute.[8]

Before the Special Master, Fariborz's brother, Faran Ferdowsi ("Faran"), attempted to testify regarding certain portions of the general ledger. Faran acknowledged that he had not been involved with S & R prior to its dispute with Fani, but he maintained that once the instant lawsuit began he was "the person in charge of gathering the information together to try to discern the payments back and forth." He stated that his knowledge of the status of the loans was gained by reviewing documents provided by Fariborz, Fani, and Shahsavari, and by speaking with each. Fani objected to the general ledger's admission into evidence, arguing that the ledger, itself, had not been authenticated:

> [Fani's counsel]: Your Honor, I have a feeling we're getting ready to start looking at a whole lot of these general ledger pages. And I want to note an objection to this witness testifying about those general ledger pages. He's not an employee of Smith & Rogers or any of the other companies, as we've already determined by reading from his deposition. There hasn't been anybody to testify to authenticate any of these general ledgers or to explain how they were prepared or whether they qualify as a business record. *So I would object*

---

[8]Portions of the general ledger were introduced at different times, and thus under different exhibit numbers, during the proceedings. Fani appears to object, on appeal, to the admission of *all* general ledger entries.

*to this witness testifying about these records until they have been properly qualified.*

[Plaintiff Companies' counsel]: My response is, number one, we produced the general ledgers to them. Number two, Michael Shahsavari said people under his employ were the folks that put together the general ledgers. Number three, . . . Faran Ferdowsi [] is the company representative here that we've designated to put this information together.

. . . .

[Fani's counsel]: I'm noting my objection to this witness testifying to records that haven't been properly authenticated or qualified as reliable business records. And Mr. Shahsavari hasn't testified about how these records are generated, but he has testified about their unreliability.

(emphasis added). The Special Master, however, overruled Fani's objection and the general ledger was admitted into evidence.[9]

---

[9]The Supplemental Report of the Special Master, which was confirmed by the trial court, provides, in relevant part:

Mr. Fani requested a specific finding as to the admissibility of Mr. Faran Ferdowsi's testimony about what he found in the Smith & Rogers records. The objection to his testimony is based on two grounds: (1) that the General Ledger was not properly authenticated as a business record, and (2) that the proof shows the General Ledger to be untrustworthy.

As to the authenticity, it appears that the parties have been working from the General Ledger almost from the beginning of this dispute. The [CPA's] report was based in part on the information found in it. Although the General Ledger was not presented with all the formality required by Tenn. R. Evid. 803(6), there is no genuine dispute that the records Mr. Faran Ferdowsi inspected during the course of his investigation were the business records of Smith and Rogers.

As to trustworthiness, the proof did show that there were errors in the information recorded in the General Ledger. But the errors make up a very small fraction of the entries that were made over the eleven years that these parties dealt with each other. Mr. Fani's attorneys found some of the errors; others were found by Mr. Faran Ferdowsi or by the attorneys representing Mr. Ferdowsi. With very few exceptions, when the error was exposed, the parties were able to agree and they moved the item to the undisputed column. I have been impressed with the level of good faith on both sides in trying to present an accurate picture of the true state of affairs of these two old friends.

I find that the Smith and Rogers records were trustworthy.

On appeal, Fani argues that the ledger was never properly authenticated as required by Tennessee Rule of Evidence 901, which provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." He further maintains that the ledger contains hearsay which does not fall within the business records exception to the hearsay rule set forth in Tennessee Rule of Evidence 803(6).

To qualify as a business record excepted from the hearsay rule, a document, itself, must satisfy five criteria:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

*Id.* Additionally, the "foundation for the admission of a business record must be provided by 'the custodian or other qualified witness.'" *Id.* Consistent with his objection below, Fani maintains that Plaintiff Companies offered no admissible evidence regarding the creation of the general ledger to satisfy the five above-cited criteria. Additionally, Fani argues that even if the ledger is authenticated, that the business records exception is, nonetheless, inapplicable because (1) Faran was not a "custodian or other qualified witness" to testify regarding the ledger and (2) because the ledger lacked trustworthiness.

At the trial level, Fani objected to Faran testifying regarding the general ledger; however, this objection was based upon the *ledger's* alleged lack of authentication and trustworthiness, not upon Faran's inability to qualify as a "custodian or other qualified witness" once the ledger was properly authenticated. **Tenn. R. Evid. 803(6)**. Accordingly, on appeal, we will address only the general ledger's authentication and trustworthiness, and not Faran's qualifications. *See Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147,

-8-

153 (Tenn. 1991) (citations omitted).

In its brief to this Court, Fani argues that the general ledger was not properly authenticated pursuant to Tennessee Rule of Evidence 901 because "Faran [] had nothing to do with the preparation of the general ledger and was only regurgitating what someone else had told him, i.e. that the general ledger was what it was represented to be." It also contends that Plaintiff Companies faced a "dilemma" with regard to the ledger: they knew its admission hinged on reliability, but they were also inclined to disclaim its accuracy in order to demonstrate that payments recorded for "goods and services" were in reality loan repayments to Fani. These ledger entry "misrepresentations," Fani argues, demonstrate that the ledger is "unreliable and misleading[,]" and therefore, inadmissible.

To satisfy Rule 901's authentication requirement, "[t]he testimony of a witness with knowledge 'that a matter is what it is claimed to be' is sufficient." *State v. Braxton*, No. M2010-01998-CCA-R3-CD, 2011 WL 5573357, at *5 (Tenn. Crim. App. Nov. 15, 2011) (citing Tenn. R. Evid. 901(b)(1)). Moreover, Rule 803(6)'s business records exception "rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable." *Alexander v. Inman*, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995) (citing *Hill v. National Life & Accident Ins. Co.*, 11 Tenn. App. 33, 37-38 (1929); 5 John H. Wigmore, *Evidence in Trials at Common Law* § 1522 (James H. Chadbourn rev. 1974); Neil P. Cohen et al., *Tennessee Law of Evidence* § 803(6).1 (2d ed. 1990)). In this case, S & R's bookkeeper/accountant Shahsavari testified by deposition that he maintains the general ledger based upon information provided by Fariborz. He acknowledged that Fariborz would, at times, misreport interest paid to Fani as payments for goods, but he explained that such mislabeling was "not a big deal" in a privately-held company because it had no effect on the company's bottom line. We find that minor misrepresentations do not render the ledger untrustworthy as a whole, and if anything, misreporting loan interest payments to Fani as something else worked to Fani's advantage. Moreover, we agree with the Special Master's conclusion that there is "no genuine dispute" that the ledger is what it is claimed to be, as it appears that both parties relied upon the ledger from the lawsuit's inception and Fani's counsel even introduced portions of the ledger into evidence on multiple occasions without objection. In sum, we find that the trial court did not abuse its discretion in finding the ledger qualified as a business record excepted from the hearsay rule, nor in admitting the ledger into evidence.

## 2. Checks

Fani also asserts that the trial court erred in admitting into evidence, certain checks which allegedly evidenced loan repayments to Fani. Fani argues that the checks were inadmissible hearsay because Faran, who testified regarding the checks, lacked personal knowledge regarding such and he was unable to testify as to whether Fani actually received payment. Like the general ledger, Fani claims that the checks are not excepted from the hearsay rule by the business records exception. However, finding no indication that Fani objected to the checks' admission below, we deem the issue waived and we decline to consider it on appeal. *See Simpson*, 810 S.W.2d at 153 (citations omitted).

## B. Piercing Corporate Veil

As stated above, after entering judgment in favor of Fani, the trial court pierced the S & R corporate veil, but it found wrongdoing only by Fariborz, and therefore, it held only him personally liable for the judgment and it dismissed the remaining third-party defendants. On appeal, Fani claims that the trial court erred in refusing to hold the other third-party defendants personally liable. Fani maintains that once the S & R corporate veil was pierced, *all* shareholders, regardless of individual culpability, should have been found individually liable. Alternatively, Fani argues that the remaining third-party defendants "acquiesce[d]" in Fariborz's disregard of the corporate form, and therefore, that each should be found personally liable for the judgment owed to Fani.

"There is a presumption that a corporation is a distinct legal entity, wholly separate and apart from its shareholders, officers, directors or affiliated corporations." *VP Bldgs., Inc. v. Polygon Group*, No. M2001-00613-COA-R3-CV, 2002 WL 15634, at *4 (Tenn. Ct. App. Jan. 8, 2002) However, as our Supreme Court has noted, "The ease with which a corporate charter may be procured, and the facility with which a corporate entity may be manipulated by its creators and made a shield for their protection should dispose a court to look through any such intended veil into the face of the individual or individuals behind." *T. Towles & Co. v. Miles*, 173 S.W. 439, 440 (Tenn. 1915). When a court is convinced that a corporate entity "'is a sham or a dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice[,]" a court may "pierce the corporate veil and attribute the actions of a corporation to its shareholders." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88 (Tenn. 2010) (citing *Cambio Health Solutions, LLC v. Reardon*, 213 S.W.3d 785, 790 (Tenn. 2006); *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140-42 (Tenn. Ct. App. 2003) (quoting *Shlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)); *see also VP Bldgs.*, 2002 WL 15634, at *4 ("Discarding the fiction of the corporate entity, or piercing the corporate veil, is appropriate when the corporation is liable for a debt but is without funds

-10-

to pay the debt, and the lack of funds is due to some misconduct on the part of the officers and directors.") (citations omitted).

The party seeking to impose individual liability upon shareholders "has the burden of proving facts sufficient to justify piercing the corporate veil." *VP Buildings*, 2002 WL 15634, at *5 (citing *Schlater*, 833 S.W.2d at 925). To determine whether a corporation's separate legal identity should be ignored, the courts of this state have consistently considered certain factors:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Id.* (quoting *FDIC v. Allen*, 584 F.Supp. 386, 397 (E.D. Tenn. 1984)). It is unnecessary that all factors weigh in favor of piercing. *Id.* Instead, it is only necessary that "the equities substantially favor the party requesting the court to disregard the corporate status." *Id.* (citing *Oceanics*, 112 S.W.3d at 140-41). However, piercing should occur only in "extreme circumstances" and "[a] corporation's separate identity should be disregarded 'with great caution and not precipitately.'" *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 437 (Tenn. Ct. App. 2008) (citing *Nepp v. Hart*, No. M2005-2024-COA-R3-CV, 2006 WL 2582503, at *7 (Tenn. Ct. App. Sept. 7, 2006); *Canter v. Ebersole*, No. E2005-02388-COA-R3-CV, 2006 WL 1627288, at *1 (Tenn. Ct. App. May 13, 2006); *Oceanics*, 112 S.W.3d at 135 (quoting *Schlater*, 833 S.W.2d at 925)).

At the outset, we note that Fariborz's personal liability for the judgment is not disputed on appeal. Moreover, the parties do not argue that the trial court erred in piercing S & R's corporate veil. The dispute focuses only on whether the trial court erred in refusing to hold the other third-party defendants–Lela Ferdowsi, Farzin and Ziba Ferdowsi, Farsheed Ferdowsi, Talieh Ferdowsi, Azar Ferdowsi, and Homey and Zohre Aminmadani–personally liable for the judgment.

## 1. Liability Upon Piercing

First, we address Fani's contention that all shareholders become personally liable when a corporate veil is pierced, notwithstanding the absence of active culpability by each. As support for this argument, Fani quotes general case law stating that once a corporate veil is pierced, the corporation's "owners" become personally liable. ***See Fidelity Trust Co. v. Service Laundry Co.***, 22 S.W.2d 6, 8 (Tenn. 1929) ("'[I]n an appropriate case, and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical.'") (quoting 7 Ruling Case Law, p.27); *Muroll Gesellschaft M.B.H. v. Tenn. Tape, Inc.*, 908 S.W.2d 211, 213 (Tenn. Ct. App. 1995) ("Corporate veils are pierced–that is–the legal entity is disregarded and the true owners of the entity are held liable when the corporation is liable for a debt but is without funds due to some misconduct on the part of the officers and directors.") (citing *Anderson v. Durbin*, 720 S.W.2d 417 (Tenn. Ct. App. 1987)). Both of the cases, however, cited by Fani to support his position involve a single stockholder. Moreover, Tennessee Code Annotated section 48-16-203(b), discussing corporate shareholder liability, directly contradicts Fani's assertion by providing that "[a] shareholder of a corporation is not personally liable for the acts or debts of the corporation except that the shareholder may become personally liable by reason of the *shareholder's own acts or conduct*." (emphasis added); *see also U.S. v. Westley*, 7 Fed.Appx. 393, 398 (6th Cir. (Tenn.) 2001) ("The shareholders of a corporation are generally not liable for the debts of a properly formed corporation unless the shareholders' own actions create a basis for liability, *e.g.*, conduct that allows a court to pierce the corporate veil."). Accordingly, we find that Fariborz's wrongdoing and disregard of the corporate form, alone, is insufficient to impose liability against the other third-party defendants. Thus, we must now consider Fani's argument that the actions of the other third-party defendants, themselves, justified imposing personal liability against each.

## 1. Lela, Ziba, Farsheed, Talieh, Azar & Zohre

First, we consider the personal liability of admitted S & R shareholders Lela Ferdowsi, Ziba Ferdowsi, Farsheed Ferdowsi, Talieh Ferdowsi, Azar Ferdowsi, and Zohre Aminmadani. Again, Fani argues that these third-party defendants "acquiesce[d]" in Fariborz's disregard of the corporate form. Specifically, Fani cites the trial court's finding that "[t]he Ferdowsi family was aware of [S & R's] insolvency" and it claims, without citation to the record, that "the shareholders were aware that Fariborz was using corporate funds for personal family reasons." Fani also points to S & R shareholder minutes, executed by the third-party defendant shareholders, which acknowledged that they "ratified, approved and adopted as valid, binding, proper and appropriate action[s,]" "all actions taken by the directors, officers, and other agents of the Corporation on behalf of the Corporation[.]"

In its [Corrected] Memorandum and Order, the trial court found that "Fariborz Ferdowsi was using corporate funds for personal family reasons." Specifically, he caused S & R to pay $85,000.00 to his daughter and he used S & R funds to purchase a car for his son. However, the trial court noted that "[a]lthough the shareholders of Smith & Rogers named in this lawsuit are related to Fariborz Ferdowsi, and may have indirectly benefit[t]ed from his business activities, he alone operated and controlled Smith & Rogers." It then further noted that "[t]he Ferdowsi son and daughter who received Smith & Rogers' assets are not shareholders." We find no evidence to support Fani's assertion that Lela, Ziba, Farsheed, Talieh, Azar and Zohre were apprised of, and acquiesced in, Fariborz's use of S & R funds for personal reasons in disregard of the S & R corporate form. We decline, under these circumstances, to impose personal liability upon each simply based upon their signing of boilerplate language in the shareholder minutes.

### 2. Farzin & Homey

### I. Shareholders of S & R

Next, we consider the personal liability of Farzin Ferdowsi and Homey Aminmadani. At the outset, we address the parties' dispute regarding whether Farzin and Homey are S & R shareholders. At trial, both Farzin and Homey denied being shareholders of S & R. However, in its [Corrected] Memorandum and Order, the trial court seemed to find that Farzin and Homey are S & R shareholders. Throughout its order, the trial court referred to the third-party defendants as "shareholders[.]" However, it also once referenced them as "third-party defendants *who are said to be shareholders*" and in describing the "Parties and Witnesses[,]" it stated:

> Fariborz Ferdowsi is the sole shareholder and owner of Delta Development and Zoo Concessions. He is the President and a 35% shareholder of Smith & Rogers with his wife Lela. Other third-party defendants/shareholders include his brothers Farzin and Farsheed Ferdowsi and their wives Ziba Ferdowsi and Talieh Ferdowsi. Cyrus Azhdari, also a third-party defendant because he was a Smith & Rogers shareholder, is deceased. Karen Ramsey, a minority Smith & Rogers shareholder, is not a party in the case. Azar Ferdowsi is a brother. Homayoun Aminmadani is a business colleague. His wife is also a shareholder.

(emphasis added). Ultimately, though, the trial court decreed that Fariborz, "as a Smith & Rogers shareholder" should be held personally liable for the judgment to Fani and that "[t]he *other shareholders*, Lela Ferdowsi, *Farzin Ferdowsi*, Ziba Ferdowsi, Farsheed Ferdowsi,

-13-

Talieh Ferdowsi, Azar Ferdowsi, *Homayoun Aminmadan*, and Zohre Aminmadani are dismissed from the third-party complaint." (emphasis added). Based upon our resolution of the veil-piercing issue below, we find it appropriate to assume, for purposes of this appeal, that Farzin and Homey are S & R shareholders.

ii.    Personal Liability of Farzin & Homey

Fani suggests four primary bases for holding Farzin and Homey personally liable for the judgment owed to it. First, Fani argues that Farzin and Homey "knew [both] that S & R was insolvent" and "that Fariborz was disregarding the corporate form and was using the funds for family and personal use[,]" "yet they[, through MRC,] continued to divert money to the business." However, like the other third-party defendants, we find no evidence that Farzin and Homey knew of Fariborz's personal use of S & R funds. In the proceedings below, Farzin and Homey explained that MRC continued to loan money to a failing S & R based upon their longstanding friendships with Fariborz and in an effort to "turn the company around." Importantly, Fani has failed to explain how MRC's loans, which were allegedly used to repay S & R's creditors, evidenced a disregard of the S & R corporate form or how such conduct was detrimental to S & R's creditors. *VP Bldgs.*, 2002 WL 15634, at *4.

Fani also points out that Farzin and Homey "were paid hundreds of thousands of dollars from Smith & Rogers" and that such payments were recorded by Fariborz as "operating supplies" although Farzin and Homey both conceded that they had never sold such to S & R. Curiously, Fani claims that Farzin and Homey have no justification for the payments to them, and that these "corporate abuses" justify piercing the S & R corporate veil. However, given Fani's own argument regarding the substantial loans by MRC to S & R, and the explanation that Fariborz mislabeled loan interest repayments as "operating supplies" "[b]ecause he was embarrassed to show [Farzin and Homey] that was the shape his business was in[,]" we find this issue without merit.

Fani next argues that Farzin and Homey should be personally liable for S & R's debts based upon their alleged creation of "sham debt" to shield S & R from its creditors. In 2003, MRC's CFO Shahsavari sent a letter notifying an S & R creditor that MRC had a UCC Financing Agreement covering S & R inventory and proceeds from S & R inventory. Attached to the financing agreement was a promissory note evidencing a $1,500,000.00 line of credit from MRC to S & R. Fani points out that when the promissory note was written, S & R owed MRC only $20,000.00, and that when the letter to S & R's creditor was written, MRC actually owed money to S & R. Thus, Fani maintains that the financing agreement was intended, not to secure a loan from MRC, but to shield S & R from its creditors. In its [Corrected] Memorandum and Order, the trial court found, in relevant part:

The Court finds that Farokh Fani was able to show that Fariborz Ferdowsi and his business colleagues created sham debt so that Smith & Rogers would be protected from other creditors.

There is however, no proof that any of the Smith & Rogers shareholders were involved in wrongdoing. The only Smith & Rogers shareholder proven to be involved in inequitable conduct as regards the Farokh Fani loans, was Fariborz Ferdowsi.

On appeal, the parties dispute whom the trial court intended to reference as "business colleagues." Of course, Fani argues that Farzin and Homey were included in the term, and Farzin and Homey deny such intention. Based upon the trial court's statement that Farzin and Homey are S & R shareholders, and its immediate acknowledgment following the discussion of the "sham debt" that no "shareholders were involved in wrongdoing[,]" we cannot conclude that the trial court found that Farzin and Homey wrongfully created a "sham debt" for the benefit of S & R. Thus, we reject Fani's argument that the trial court's alleged finding of wrongdoing by Farzin and Homey necessitates the imposition of individual liability against each. Furthermore, although the line of credit had not yet been fully extended when the promissory note was executed or when the letter to an S & R creditor was sent, Shahsavari testified at trial that over $3,270,000.00 has been advanced to S & R pursuant to its line of credit with MRC.[10]

Next, Fani makes arguments regarding a so-called "Zoo Note." As stated above, Delta was formed in order to develop a zoo in middle Tennessee through capital provided by Farzin and Homey. A zoo facility was opened, but the facility and its assets were later sold to a non-profit company. In exchange for the sale, Delta received a $4,992,106.73 Nonrecourse Promissory Note (the "Zoo Note"). Fani claims that although Delta "was supposed to be wholly owned by Fariborz Ferdowsi and his wife, Lela[,]" in 1997, Farzin and Homey "forgave" $750,000.00 in Zoo Note interest owed to Delta. Delta had no assets aside from the Zoo Note, and therefore, Fani claims that this "forgiveness" of accrued interest was detrimental to Delta's creditors, including himself. Delta subsequently transferred the Zoo Note to Hospitality Group of Oklahoma, Inc. ("HGO") and MRC, both owned by Farzin and Homey, allegedly in exchange for the release of a debt owed to HGO and MRC. Fani seems to argue that upon transfer, Farzin and Homey became individually liable to Delta's creditors, either as Delta or S & R shareholders.

_____

[10]Additionally, Fani's counsel stated that Fani made no allegation that funds were not actually advanced pursuant to the line of credit.

Even if we were to assume, *arguendo*, that liability attached upon transfer, the record before us indicates that HGO and MRC ensured that Delta had no unpaid creditors. Shahsavari testified that Farzin and Homey forgave the interest owed on the Zoo Note in "an effort to induce the Nashville Zoo to . . . raise funds to pay the note off." Although this action reduced the value of Delta's only asset, Farzin and Homey, through MRC, paid off each of Delta's creditors. Accordingly, we find their conduct does not merit the imposition of personal liability.

Finally, Fani contends that Farzin and Homey "through MRC and related companies" essentially controlled S & R and "facilitated S & R's fraud through their bookkeeping at MRC." Fani correctly points out that MRC CFO Shahsavari maintained the Delta Trades International database which contained S & R's financial accounting records and that he possessed check-writing authority for S & R. Fani maintains, without citation to the record, that the shared database "allowed the entities to record transactions and obligations among each other without creating the paperwork that would normally be generated by separate companies. Obligations of one company would be paid by another because its bank account had some money in it, and the transaction would simply be recorded with a ledger entry." Fani points out that MRC handled S & R's "taxes, the sales taxes, [and its] corporate papers[,]" and it correctly notes that Paymaxx, controlled by Farzin and Homey, previously performed the payroll processing for S & R and that Melrose, LLC, owned in part by Farzin and Homey, was previously S & R's landlord.

On appeal, we are considering only whether Farzin and Homey may be reached through Plaintiff Companies, not whether the corporate veils of non-parties MRC, Paymaxx, or Melrose, LLC should be pierced. Fani attempts to depict a situation in which funds were transferred among numerous entities without documentation, but the record simply does not support this suggestion. Shahsavari did testify that MRC *loaned* money *to* S & R without the formality of promissory notes; however, we find no evidence that S & R's funds were similarly *depleted*. In sum, we find the fact that companies owned by Farzin and Homey enjoyed a business relationship with S & R does not evidence a disregard of the corporate form, and therefore, this relationship provides an insufficient basis for imposing personal liability against each.

### C. "Starting Point" for Calculating Loan Balance

As stated above, the Special Master found that the appropriate "starting point" for calculating the debt owed to Fani was a schedule of loan disbursements and repayments, which evidenced a balance of $179,268.84 as of January 1, 1994, rather than handwritten letters from Fani, which evidenced a balance of $105,251.58 as of that same date. On appeal,

Plaintiff Companies and third-party defendants argue that the trial court erred in accepting the Special Master's determination, offering three reasons why Fani's handwritten notes should be used to establish the "starting point" for calculating the judgment owed: (1) the notes are admissions against interest; (2) the first note was written prior to a time when banking records were available; and (3) the note amounts are corroborated by monthly interest payments made to Fani.

Our standard for reviewing the findings of a special master is set forth in Tennessee Code Annotated section 27-1-113, which provides that

> Where there has been a concurrent finding of the master and chancellor, which under the principles now obtaining is binding on the appellate courts, the court of appeals shall not have the right to disturb such finding.

Our case law has more-fully explained this principle:

> The trial court's order referring certain matters to the Special Master, the Special Master's report, and the trial court's order on the report affect our standard of review on appeal. *See Manis v. Manis,* 49 S.W.3d 295, 301 (Tenn. Ct. App. 2001); *Archer v. Archer,* 907 S.W.2d 412, 415 (Tenn. Ct. App. 1995). Generally, concurrent findings of fact by a special master and a trial court are conclusive and cannot be overturned on appeal. *Manis,* 49 S.W.3d at 301. However, a concurrent finding is not conclusive where it is upon an issue not properly referred to a special master, where it is based upon an error of law or a mixed question of fact and law, or where it is not supported by any material evidence. *Id.*

*Bradley v. Bradley*, No. M2009-01234-COA-R3-CV, 2010 WL 2712533, at *6-7 (Tenn. Ct. App. July 8, 2010 (citing *Pruett v. Pruett,* No. E2007-00349-COA-R3-CV, 2008 WL 182236, at *4 (Tenn. Ct. App. Jan. 22, 2008) (quoting *Dalton v. Dalton,* No. W2006-00118-COA-R3-CV, 2006 WL 3804415, at *3 (Tenn. Ct. App. Dec. 28, 2006)). Thus, our standard of review, regarding findings made by both the special master and the chancery court, is similar to that applied in a jury trial, "'we must affirm if there is any material evidence to support the trial court's concurrence.'" *Id.* (quoting *In re Estate of Ladd,* 247 S.W.3d 628, 636-37 (Tenn. Ct. App. 2007)).

In his July 18, 2008 report, the Special Master carefully explained the evidence supporting his finding. He considered Fani's testimony that a January 6, 1994 note showing a balance of "$105,251.28" "as of 1-1-94" represented an "arrangement" with Farzin rather than the total owed to him, and he highlighted the fact that Fariborz lacked records from that time period to support his assertion that the note evidenced the total debt owed by him.

Believing that the note could have represented an unaccepted offer to settle, the Special Master refused to find that the note was an admission that, as of January 1, 1994, the total debt owed to Fani by Farzin was $100,000.00 plus interest. Based upon the foregoing, we find material evidence to support the concurrent findings of the Special Master and the chancery court regarding the appropriate "starting point" for determining the debt owed to Fani.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellants, F. Fani Gulf International, Gulf International, Farokh Fani, and F. Fani/Gulf International, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.